*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

BRIAN KELLEY GRANGER,

Defendant-Appellant.

UNPUBLISHED
August 4, 2022

No. 355477
Midland Circuit Court
LC No. 83-004565-FC

Before: GLEICHER, C.J., and SAWYER and GARRETT, JJ.

PER CURIAM.

In 1983, Brian Granger was convicted of first-degree felony murder, MCL 750.316(1)(b), in the killing of Sandra Nestle. Granger was 17 years old at the time of the offense. The trial court sentenced Granger to life imprisonment without parole, the penalty then-required under Michigan law. In a pair of seminal decisions from the last decade, the United States Supreme Court held that a mandatory life-without-parole sentence for a juvenile offender[1] constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution, *Miller v Alabama*, 567 US 460, 489; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and that this new rule applied retroactively on state collateral review, *Montgomery v Louisiana*, 577 US 190, 206; 136 S Ct 718; 193 L Ed 2d 599 (2016).

In accordance with *Miller*, *Montgomery*, and Michigan law, Granger received a hearing in 2019 to determine whether he should be resentenced to life without parole or instead to a term-of-years sentence. The resentencing court found none of the factors described in *Miller* as mitigating and resentenced Granger to life without parole. Because the resentencing court erred in its consideration of several *Miller* factors and those factors do not show that Granger is the rare juvenile offender for whom a sentence of life without parole is appropriate, we vacate Granger's sentence and remand for resentencing to a term of years.

---

[1] We use "juvenile offender" throughout this opinion to describe someone who was less than 18 years old at the time the offense was committed.

## I.  BACKGROUND

On June 21, 1983, Granger, who was 17 years old at the time, attacked and killed Nestle while she was jogging.  Granger admitted to killing Nestle, claiming that he choked her until she was unconscious.  However, her body was discovered lying face down and nude in a drain, with the cause of death determined to be drowning.  Granger also admitted to removing Nestle's clothes and stated that he took down his own pants to sexually assault her, but then changed his mind.  At a bench trial, the court found Granger guilty of felony murder for killing Nestle during the commission or attempted commission of criminal sexual conduct.  The court sentenced him to life in prison without the possibility of parole, as required under Michigan law at the time.

In 2012, the United States Supreme Court held in *Miller*, 567 US at 489, that a mandatory life-without-parole sentencing scheme for juvenile homicide offenders violates the Eighth Amendment's prohibition on cruel and unusual punishment.  Four years later, the Court announced that *Miller* applied retroactively, entitling Granger to a resentencing hearing.  *Montgomery*, 577 US at 206.  "After *Miller* but before *Montgomery*, our Legislature enacted MCL 769.25, which set forth the procedure for resentencing criminal defendants who fit *Miller*'s criteria, provided either that their case was still pending in the trial court or that the applicable time periods for appellate review had not elapsed."  *People v Wiley*, 324 Mich App 130, 137; 919 NW2d 802 (2018).  Expecting that *Miller* would be afforded retroactive application, our Legislature also enacted MCL 769.25a, "which set forth the procedure for resentencing defendants who fit *Miller*'s criteria even if their cases were final."  *Id*.

MCL 769.25a requires the prosecutor to file a motion for resentencing if it intends to seek another life-without-parole sentence against a juvenile offender.  MCL 769.25a(4)(b).  The resentencing court must hold a hearing on the motion and determine whether to sentence the defendant to life without parole or to a term of years.  MCL 769.25a(4)(b); MCL 769.25(9).  For a term-of-years sentence, the minimum sentence imposed must be between 25 and 40 years.  MCL 769.25(9).  In this case, the Midland County prosecutor requested that Granger receive another life-without-parole sentence on resentencing.  The prosecutor's resentencing motion specified three factors warranting life without parole: the circumstances of the crime, Granger's prior juvenile history, and the wishes of the victim's family that this sentence be imposed.  Following a three-day *Miller* hearing, the resentencing court issued an opinion and order again sentencing Granger to life without parole.  This appeal followed by right.

## II.  *MILLER* FACTORS

Granger argues that the evidence presented at the *Miller* hearing did not support the resentencing court's decision to impose another life-without-parole sentence.

We review a trial court's decision to impose a life-without-parole sentence under MCL 769.25 for an abuse of discretion.  *People v Skinner*, 502 Mich 89, 134; 917 NW2d 292 (2018).  A court abuses its discretion when its decision falls outside the range of principled outcomes.  *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).  "The trial court's fact-finding at sentencing is reviewed for clear error."  *People v Lampe*, 327 Mich App 104, 125-126; 933 NW2d 314 (2019).  "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is

left with a definite and firm conviction that a mistake has been made." *People v Antwine*, 293 Mich App 192, 194; 809 NW2d 439 (2011) (quotation marks and citation omitted).

In *Miller*, the United States Supreme Court recognized that the attributes of youth diminished the penological justifications for imposing life imprisonment without parole on juvenile offenders. *Miller*, 567 US at 472. *Miller* relied heavily on the Supreme Court's earlier decisions in *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005), and *Graham v Florida*, 560 US 48; 130 S Ct 2011; 176 L Ed 2d 825 (2010). *Roper*, 543 US at 578, held that the Eighth Amendment forbids imposing the death penalty on juvenile offenders. Five years later came *Graham*, 560 US at 82, which constitutionally prohibited life-without-parole sentences for juvenile nonhomicide offenders. Together, "*Roper* and *Graham* establish[ed] that children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 US at 461.

As *Miller* explained, mandatory life-without-parole sentences for juvenile homicide offenders necessarily "preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Id*. at 476. In *Skinner*, our Supreme Court set forth these circumstances, discussed in *Miller*, that a court should consider in deciding whether to impose a sentence of life imprisonment without parole on a juvenile offender:

> The following are the factors listed in *Miller*: (1) "his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) whether "he might have been charged [with] and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and (5) "the possibility of rehabilitation . . . ." [*Skinner*, 502 Mich at 114-115, quoting *Miller*, 567 US at 477-478.]

"It is undisputed that all of these factors are mitigating factors," and are factors "that 'counsel against irrevocably sentencing [juveniles] to a lifetime in prison.' " *Skinner*, 502 Mich at 115, quoting *Miller*, 567 US at 480. At a *Miller* resentencing hearing, the court must consider these factors and any other relevant criteria, "including the individual's record while incarcerated." MCL 769.25(6). The court may also consider "the traditional objectives of sentencing – punishment, deterrence, protection, retribution, and rehabilitation." *People v Garay*, 506 Mich 936, 937; 949 NW2d 673 (2020). When rendering its sentence, the court must explain the "aggravating and mitigating circumstances" that it considered and why it chose the sentence imposed. MCL 769.25(7).[2]

---

[2] Since Granger's resentencing hearing, our Supreme Court also clarified that "at a *Miller* hearing, the prosecutor bears the burden to rebut a presumption that LWOP is a disproportionate sentence"

*Miller* made clear that a life-without-parole sentence for a juvenile offender will generally be disproportionate, such that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Miller*, 567 US at 479. Put differently, sentencing a child to life without parole is excessive for all but "the rare juvenile offender whose crime reflects irreparable corruption." *Id*. at 479-480. In such a case, the sentencing judge might find that the juvenile offender "exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified." *Montgomery*, 577 US at 208. But where the crime committed by a juvenile reflects "the transient immaturity of youth," life without parole is an unconstitutional penalty. *Id*.

In *People v Bennett*, 335 Mich App 409, 419-420; 966 NW2d 768 (2021), we discussed the differences at play when applying the *Miller* factors to a juvenile offender being sentenced for the first time versus evaluating the sentence of an adult who was first sentenced to life without parole as a juvenile offender:

> The focus of the analysis necessarily shifts when a court considers an appropriate sentence for an adult who was sentenced to a lifetime of imprisonment for a crime committed as a juvenile. While sentencing a young person, a judge looks forward and endeavors to predict the future. *Miller* counsels that a careful examination of the offender's developmental characteristics, his or her family environment, and the circumstances surrounding the crime help guide a determination of whether that child will ever be capable of change. Resentencing an adult requires restructuring the evidentiary review; the older the adult, the larger the predictive canvas becomes. While the *Miller* factors remain highly relevant, a judge resentencing an offender who has served many years in prison has the benefit of actual data regarding whether the offender's life in prison is truly consistent with "irreparable corruption," the only ground *Miller* specifically identified for imposing a life-without-parole sentence. See *Miller*, 567 US at 479-480.

In Granger's case, therefore, the resentencing court needed to consider his 35 years of incarceration and whether the evidence amassed during that time reflected irreparable corruption. The resentencing court ultimately concluded that none of the *Miller* factors were mitigating and imposed a life-without-parole sentence. Because many of the resentencing court's findings were clearly erroneous and contrary to the evidence presented that life-without-parole was a disproportionate sentence for Granger, the court's sentence constituted an abuse of discretion.

## A. HALLMARK FEATURES OF YOUTH AND FAMILY ENVIRONMENT

The first two *Miller* factors address the juvenile's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate the risks and consequences," and the offender's family and home environment. See *Miller*, 567 US at 477. We address these factors together because the relevant evidence informing each factor is intertwined.

---

by clear and convincing evidence. *People v Taylor*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 154994); slip op at 1-2 (footnote omitted).

Despite substantial evidence that Granger experienced a chaotic and turbulent childhood, one which contributed to violent, impulsive, and immature behavior, the resentencing court found that the first two *Miller* factors had no mitigating effect. These findings were clearly erroneous because they were largely unsupported by the evidence and relied, in part, on factual mistakes and omissions.

"[Y]outh is more than a chronological fact." *Eddings v Oklahoma*, 455 US 104, 115; 102 S Ct 869; 71 L Ed 2d 1 (1982). Juveniles are "more vulnerable or susceptible to negative influences and outside pressures," exhibit "comparative immaturity and irresponsibility," and hold "transitory" personality traits. *Roper*, 543 US at 569-570. "From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Id*. at 570. Sentencing courts should "start from the premise that the juvenile defendant before them, like most juveniles, has engaged in criminality because of transient immaturity, not irreparable corruption." *People v Taylor*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 154994); slip op at 16.

At the *Miller* hearing, Dr. Daniel Keating, Ph.D., an expert in adolescent cognitive brain development, testified about the scientific understanding of adolescent brain development and the impact of childhood trauma. Dr. Keating explained that changes in brain development continue into the mid-20s and testified that Granger, at 17 years and 8 months old, fell between mid-and-late adolescence. At his age, Dr. Keating opined, an adolescent's brain would generally be slightly or somewhat more mature than a 14-year-old's brain.

Dr. Jeffrey Wendt, Ph.D., an expert in clinical and forensic psychology, reviewed relevant case files from Granger's trial, as well as Granger's psychological reports and prison records. Dr. Wendt also interviewed Granger for nearly six hours. Dr. Wendt testified that Granger's crimes reflected "transient immaturity in an adolescent who was overwhelmed by his violent and chaotic environment that he was raised in . . . and living in at the time."

Evidence at the *Miller* hearing thoroughly confirmed Granger's violent and chaotic childhood. Granger's mother, Susan, recounted that Granger's father physically, sexually, and emotionally abused her. Their children, including Granger, were aware of the abuse as the children grew older. Susan testified that Granger heard their fights and called down from upstairs for his father not to hurt Susan. In one incident, Granger's father responded by threatening, "[I]f you want . . . some of it, come on down." Granger's sister, Brenda, also testified that Granger tried to intervene when their father was abusing Susan, and their father would threaten him. Because of the physical and sexual violence she endured at the hands of Granger's father, Susan left the home to stay at shelters on several occasions. She recalled that she would be forced to leave the home without warning in the middle of the night while the children slept, because that was when Granger's father would often assault her. Brenda similarly testified that their mother was absent for months at a time when she tried to leave their father, and she sometimes left without warning. Susan also testified that the family lived in nine or ten homes throughout her marriage, including some rat-infested farmhouses with no insulation. She stated that she often did not have enough money for groceries, and the neighbors would help if the children told them they did not have any food.

Regarding physical abuse of the children, Susan testified that Granger's father rarely disciplined the children, but one time, Granger's father grabbed Granger and "slammed him against the wall." Susan added that she would discipline the children by giving them a "crack" with a belt. Brenda testified that both of their parents used corporal punishment; Susan would use a belt and her father would use his hands. Brenda also added that their father emotionally abused her and called her derogatory names. The resentencing court erroneously overlooked evidence of the father's physical abuse and suggested that only Susan was responsible for physical discipline. Nevertheless, the court's focus on which parent abused or did not abuse Granger is misguided. In either event, the evidence established that Granger suffered and witnessed profound physical abuse during his childhood.

When asked about Granger's demeanor as a child, Susan testified that Granger was prescribed Ritalin for hyperactivity. Dr. Wendt described Ritalin as a treatment for attention deficit hyperactivity disorder (ADHD), and explained that this diagnosis has characteristics that mirror the hallmark features of youth. As a result, Dr. Wendt opined, Granger "responded impulsively in a lot of situations, quite often in anger and failed to adequately consider the consequences of his behavior." Granger's mother explained that as Granger became older, he became more withdrawn and fought with his brother Leslie. Susan added that on one occasion, she and the children were referred to mental health counseling, but Granger's father would not let them attend.

Considering this background, Dr. Wendt testified that Granger's "chaotic and violent home life led to increasing behavioral dysregulation, impulsivity, [and] a tendency to respond with violent behavior when faced with stress," much more than would the average adolescent. Dr. Wendt also stated that Granger's "violent behavior as a youth is more the product of environmental factors and his transient immaturity, [and] the chaotic and violent environment that he was in as opposed to his personality structure and his internal character . . . ." This conclusion was supported by the fact that, while in prison, Granger showed no violent tendencies and received no assaultive misconduct tickets.

Despite this evidence, the resentencing court found that Granger's age and its hallmark features had no mitigating effect. The court noted that Granger was 17 years and 8 months old at the time of the offense. Relying on the testimony of law enforcement officials involved in the murder case, the court determined that Granger was "mature for his age" and "appreciated the risks and consequences of his action[s]." The resentencing court did, however, concede that Granger's "past record and admitted behavior show[ed] some transient immaturity." Specifically, the court cited Granger's substance abuse history and fights with his brother, but also found that Granger "continually lied about his drug use in an effort to elicit sympathy."[3] The resentencing court also noted that Granger continued to escalate his sexual crimes, and used this to find that the present offense was not attributable just to transient immaturity.

---

[3] It appears that the resentencing court was referring to Granger's changing story about how he killed the victim, stating in one police interview that he did not use drugs or alcohol before the crime and later claiming during a forensic evaluation before trial that he killed Nestle while under the influence of drugs.

As an initial matter, Granger's continued escalation of sexual offenses was supported by the evidence. In 1981, Granger was found guilty in separate incidents for indecent exposure and digital penetration of a minor. Granger was placed at Boysville Detention Center, a juvenile facility, for around 15 months. Granger then spent a few months at a halfway house before returning home to his parents in June 1983. Six days later, he killed Sandra Nestle. Therefore, the resentencing court's consideration of Granger's intensifying criminal conduct was proper.

With respect to Granger's juvenile drug use, the resentencing court largely ignored evidence that Granger had a substance abuse problem at the time of the offense. The record of Granger's substance abuse was overwhelming, while the resentencing court's finding that Granger self-reported substance abuse to "elicit sympathy" was unsupported. Granger's mother, Susan, testified that the family did not keep alcohol in the home, but she also stated that she was aware that Granger was using drugs before being sent to a juvenile facility in 1981. The original presentence investigation report (PSIR) also states that Granger's mother and father reported that they were unsure when Granger began using alcohol and drugs but that he had been doing so for "a long time." Further, all of Granger's major misconduct tickets during his initial years in prison involved personal substance use. Dr. Wendt testified that this continued use of controlled substances upon entering prison reflected Granger's substance abuse problems and his continued immaturity. In sum, there was clear, substantiated evidence that Granger abused controlled substances as a juvenile. The resentencing court clearly erred in its summation of this evidence.

There is also an inherent tension between the resentencing court's findings that Granger exhibited some transient immaturity but that this first *Miller* factor presented *no* mitigating effect. Chronological age and the hallmark features of youth is a mitigating factor, see *Skinner*, 502 Mich at 115, and by concluding that Granger demonstrated those hallmark features, at least to some degree, this first factor should have had some mitigating effect.

As for Granger's family and home environment, the resentencing court accurately found that the record was "replete with evidence as to the dysfunctional nature of [Granger's] home environment and his parents." Incredibly, however, the court found that this factor did not have a mitigating effect because there was no evidence presented that his childhood was "extremely abnormal for the area"[4] or that it was an "extraordinarily brutal home from which he could not extricate himself." This finding was clearly erroneous as the evidence established that Granger experienced a chaotic and traumatic childhood. The testimony of Granger's family members consistently demonstrated that his childhood and home environment was rife with poverty, physical abuse, and traumatic experiences—including, to reiterate a few, witnessing his father severely abuse his mother and dealing with his mother's long absences from the home. Evidence presented also demonstrated that Granger's dysfunctional home environment contributed to his expression of the hallmark features of youth. Accordingly, the first two *Miller* factors overwhelmingly mitigated in favor of a term-of-years sentence.

---

[4] That other children in the area at the time may have experienced similarly chaotic and dysfunctional home environments does not render the evidence of Granger's home life any less mitigating.

## B. CIRCUMSTANCES OF THE OFFENSE

The third *Miller* factor considers the circumstances of the crime, "including the extent of [the defendant's] participation in the conduct and the way familial and peer pressures may have affected him." *Miller*, 567 US at 477. The resentencing court found that the circumstances of the crime showed that it was premeditated and not an impulsive or unintentional act. The court found that Granger continued to assault the victim despite several opportunities to stop and reconsider his actions. The court also noted that Granger committed the crime on his own, without any peer or family pressure. These findings are supported by the original trial judge's findings after Granger's bench trial. In rendering Granger guilty of felony murder, the judge found that he "intended to kill Sandra Nestle and that he carried her to a spot and placed her so that she would die of drowning to hide his guilt in attempted commission or commission of criminal sexual conduct." Because the evidence supported the resentencing court's finding that Granger committed the offense alone and with some degree of premeditation, the court did not clearly err when it found that the circumstances of the offense was not a mitigating factor.

Nevertheless, this consideration alone did not merit a life-without-parole sentence. As we have previously explained:

> [N]early every situation in which a sentencing court is asked to weigh in on the appropriateness of a life-without-parole sentence will involve heinous and oftentimes abhorrent details. After all, the sentence can only be imposed for the worst homicide offenses. However, the fact that a vile offense occurred is not enough, by itself, to warrant imposition of a life-without-parole sentence. The court must undertake a searching inquiry into the particular juvenile, as well as the particular offense, and make the admittedly difficult decision of determining whether this is the truly rare juvenile for whom life without parole is constitutionally proportionate as compared to the more common and constitutionally protected juvenile whose conduct was due to transient immaturity for the reasons addressed by our United States Supreme Court. [*Bennett*, 335 Mich App at 426 (quotation marks and citation omitted).]

Our review of the entire record, as previously described and continued below, establishes that the life-without-parole sentence imposed on Granger was constitutionally disproportionate.

## C. WHETHER THE DEFENDANT WOULD HAVE BEEN CHARGED WITH AND CONVICTED OF A LESSER OFFENSE IF NOT FOR JUVENILE INCOMPETENCIES

As for the fourth *Miller* factor—whether Granger might have been charged with, and convicted of, a lesser offense were it not for "incompetencies associated with youth," *Miller*, 567 US at 477-478—the resentencing court disagreed with Granger's contention that he would have been charged with or convicted of a lesser offense if not for his cooperation or confession. This factor considers the defendant's ability to deal with police officers, prosecutors, and defense counsel. *Id.* Granger made multiple statements to police officers, in which he ultimately confessed to killing Nestle. The resentencing court relied on testimony from law enforcement officers and the original trial court's findings at a suppression hearing to conclude that Granger understood the

risks of speaking with the police and was not naïve or intimidated in his interactions with investigators. Clare Fox, a retired police officer involved in the murder investigation, testified that she was present during Granger's second police interview. Fox testified that Granger appeared relaxed and stated that he knew what his rights were because of his prior juvenile criminal history.

For similar reasons explained in our discussion of Granger's transient immaturity, we do not agree with the resentencing court's finding that the evidence demonstrated that Granger's "behavior at all stages of the investigation and trial [was] consistent with normal, adult defendants." That said, we cannot conclude that the resentencing court clearly erred by finding that this factor was not mitigating because evidence revealed that Granger likely still would have been charged or convicted with felony murder even without his statements to police.

Norman Donker, the original trial prosecutor, testified that the prosecutor's office decided not to offer Granger a plea deal to a lesser charge. Donker explained that this decision stemmed from multiple factors, including the strength of the case, the circumstances of the crime, and Granger's juvenile record. Even assuming that Granger would not have made incriminating statements but for the incompetencies of youth, the resentencing court found that Granger's statements were not the basis for the criminal sexual conduct charge that served as the predicate felony for the felony-murder conviction. Instead, physical evidence was used to support this charge. This included the presence of semen in the victim's vagina, the fact that she had been stripped naked, and the injuries to the victim's buttocks. Further, eyewitnesses testified at Granger's bench trial to observing Granger on his bicycle near a jogger. One witness, Lois Cline, testified that she saw Granger riding behind Nestle and closing in on her. Considering the physical evidence and eyewitness testimony, the resentencing court did not clearly err by finding that Granger still would have been charged with felony murder, and thus, that this factor was not mitigating.

## D. POSSIBILITY OF REHABILITATION

The final *Miller* factor concerns "the possibility of rehabilitation." *Miller*, 567 US at 478. "In the usual sense, 'rehabilitation' involves the successful completion of vocational, educational, or counseling programs designed to enable a prisoner to lead a useful life, free from crime, when released." *Bennett*, 335 Mich App at 426. Perhaps most egregiously, the resentencing court found that this factor was not mitigating because Granger's behavior did not "indicate rehabilitation to the extent that the community would be safe." In so finding, the resentencing court overlooked the abundant evidence supporting Granger's rehabilitation and rested its ultimate conclusion on a misunderstanding of law.

Granger's prison record over 35 years was exemplary and highly inconsistent with irreparable corruption. Carol Howes was a former warden for 27 years at several Michigan state prisons, including serving as Granger's warden for approximately one year. Howes reviewed Granger's prison records and prepared a report. Howes testified that Granger had only four "Class I" misconduct tickets, all involving substance abuse early in Granger's incarceration. The quantity of substance associated with these misconduct tickets suggested personal substance use rather than sales of contraband. Granger's last "Class I" misconduct ticket was over 26 years ago. Granger had received 17 less serious misconduct tickets over the years for violations of prison rules, with the last coming in 2015 for the improper use of a phone. None of them involved fighting or

physically violent behavior. While incarcerated, Granger completed several college courses. Granger also held various work assignments, including a position dedicated to observing suicidal prisoners. Howes also reviewed Granger's background information. She testified that she had reviewed thousands of inmate files over her career and described Granger's childhood as "one of the most . . . dysfunctional family situations" that she had ever seen in a prisoner file. Given these circumstances, Howes testified that Granger's ability to avoid violence in prison reflected very positively on him.

Dr. Wendt testified that he reviewed the diagnostic psychological evaluation and substance abuse assessment conducted on Granger when he entered prison in 1984. The psychological evaluation remarked that Granger had a very violent propensity and would need significant intervention and supervision as a result. However, Granger did not exhibit violent behavior throughout his decades of imprisonment and had never received an assaultive misconduct. Dr. Wendt also stated that Granger's initial substance abuse assessment predicted that he would struggle with substance abuse in prison, and in fact he did for several years. Demonstrating his growth, Granger had not received a substance abuse ticket in over 20 years and successfully maintained his sobriety. Also, Dr. Wendt administered a sexual violence risk assessment, which indicated a low risk of future sexual violence. Granger also introduced a comprehensive reentry plan, should he be released, that covered everything from housing and transportation to health care and substance abuse treatment.

The resentencing court seemingly dismissed the testimony of Howes and Dr. Wendt because of the court's belief that both witnesses were "relying on information supplied by [Granger] which [was] in direct conflict with the other testimony and evidence." With respect to Howes, very little of her testimony relied on information that Granger told her or others. Howes testified that she reviewed Granger's prison records, which consisted of significant amounts of independent evidence showing Granger's rehabilitation. Howes also drew some conclusions from the information in the PSIR, and Howes denied that most of this material would have been formulated solely on the basis of Granger's self-reporting. In fact, much of the information in the PSIR about Granger's family life was substantiated at the *Miller* hearing by Granger's mother and sister. The resentencing court similarly overstated Dr. Wendt's reliance on self-reporting by Granger. While Dr. Wendt appeared to rely on more self-reporting of information than Howes, he also reviewed prison records, as well as records relating to the murder investigation and bench trial. And Granger's description of his childhood in his interview with Dr. Wendt was also confirmed in many ways by familial testimony at the *Miller* hearing. Thus, as with other *Miller* factors, the resentencing court's inaccurate portrayal of Granger's home life and substance abuse affected its analysis of this factor.

In its opinion, the resentencing court stated:

> *This Court cannot find that this defendant is incapable of reform, or "irreparably corrupt"*[;] however that is not the legal standard. Indeed, it is impossible to prove that a person will or will not do some action in the future. The best that can be done is to take an objective look at past and present behavior as a reasonable indicator of the future. It is clear from the record submitted that Defendant has conformed his behavior and done very well in the highly structured environment of prison, just as he did well in the structured environment of

Boysville. However, this Court does not believe that doing well in a structured, guarded environment means that the Defendant is truly changed especially when he has not accepted responsibility in the form of truthfully taking responsibility for all the choices he has made and the crimes he has committed.

This Court looks at the evidence presented and finds that Defendant is still not telling the truth so as to minimize his responsibility and the severity of his actions and so *though he is by all accounts a model prisoner, this behavior does not indicate rehabilitation to the extent that the community would be safe*. [Emphasis added.]

As Michigan courts interpreting *Miller* and *Montgomery* have made clear, "courts are not allowed to sentence juveniles who are not irreparably corrupt to life without parole." *Skinner*, 502 Mich at 125. Although *Skinner*, 502 Mich at 128, held that resentencing courts need not make an explicit finding that a defendant is irreparably corrupt, the resentencing court here essentially conceded that Granger was *not* irreparably corrupt, thereby compelling a term-of-years sentence. The court also erred when it found that this *Miller* factor could not favor Granger because even though his behavior while incarcerated had been exemplary, it was unclear whether he might be a risk once released. That is not a proper consideration. The resentencing court was to determine whether Granger had shown "the possibility of rehabilitation," *Skinner*, 502 Mich at 114-115, or, as discussed in *Bennett*, "whether the offender's life in prison is truly consistent with 'irreparable corruption,' the only ground Miller specifically identified for imposing a life-without-parole sentence." *Bennett*, 335 Mich App at 419-420.

Further, "[t]o the extent that the resentencing court made a factual finding regarding [Granger's] risk of reoffending, it was clearly erroneous because no evidence supported it." See *Bennett*, 355 Mich App at 434. The resentencing court's conclusion that Granger's exemplary prison record is not predictive of how he would act on release is improperly speculative, if not inaccurate. No record evidence of Granger's actions over the last 35 years supports a finding that he is a risk to reoffend. The extensive "predictive canvas" gleaned from the prison records and other evidence supports that Granger's behavior is inconsistent with irreparable corruption. See *Bennett*, 335 Mich App at 420. Granger has exhibited no violent tendencies while incarcerated, even when, as Howes testified, the entire prison environment at the time would have pressured Granger into acting criminally or violently. From all accounts, Granger has been a model prisoner. When considered alongside Granger's highly dysfunctional background, which Howes testified made his prison record even more remarkable, this factor mitigates strongly in favor of a term-of-years sentence.

The resentencing court's conclusion that this factor was not mitigating rested largely on its belief that Granger had not taken full responsibility for his crime. The resentencing court found that Granger's statements to Dr. Wendt and Howes minimized his culpability for the murder, placed fault with the physical abuse he suffered as a child, and downplayed his misconducts in prison. A juvenile offender need not show that he is wholly and unconditionally rehabilitated, such that there is no additional need for growth, to be entitled to a term-of-years sentence. The resentencing court's findings about Granger's acceptance of responsibility did not prove that he was "the rare juvenile whose crime reflects irreparable corruption," *Miller*, 567 US at 479-480,

-11-

nor that he exhibited "such irretrievable depravity that rehabilitation is impossible," *Montgomery*, 577 US at 208.

Even so, there was significant evidence that Granger had taken accountability for his actions. During allocution at the *Miller* hearing, Granger stated that he took full responsibility for Nestle's murder. Granger added:

> I thought a lot about what I could possibly say to explain the remorse and anguish that I've lived with knowing that I took Sandra Nestle's life. I grew up with a lot of violence and use of violence often, but killing Sandra Nestle and seeing what I was capable of made me never want to use violence again. I entered prison never wanting to hurt anyone else or cause any type of pain that I caused by killing Sandra Nestle to anybody else.
>
> I know there's nothing I can do now to take back what I did, but if there's anything that I can say to her loved ones, possibly to try to help them heal, I would like to. I've always had trouble showing emotions on the outside, but I assure you, I feel your pain. And I'm truly sorry.
>
> I've thought about Ms. Nestle and her family daily for the past 36 years. In preparing for this hearing . . . I read the victim's impact statements submitted to the Court, and I know that I robbed her children, her grandchildren, her siblings, and her parents of a life they could have shared with her.

Granger also personally apologized to the victim's sister, who had movingly testified at the hearing about the pain that Nestle's death caused their family. Similarly, Dr. Wendt testified that Granger expressed remorse several times during their interview, including stating that he prayed for the victim's family and that his actions "led to him deciding never to behave in a violent manner again." Dr. Wendt added that Granger tended to minimize responsibility when he was younger but that Granger now took full responsibility, without excuses, for the murder.

Overall, there was abundant evidence substantiating that Granger had been rehabilitated, despite his dysfunctional childhood and his youth upon entering prison. This factor strongly mitigated in favor of a term-of-years sentence.[5]

---

[5] The resentencing court considered it "noteworthy" that the original trial judge believed that life without parole was an appropriate sentence in 1984 and in 1992, when that judge wrote a letter opposing Granger's request for executive clemency. Although the resentencing court has discretion to consider "any other criteria relevant to its decision," MCL 769.25(6), we fail to see how the original trial judge's opinion from decades prior is relevant to whether life without parole is a proportionate sentence under *Miller*, particularly when that judge had no discretion to impose anything but life without parole.

## III.  RESENTENCING BEFORE A NEW JUDGE

Granger also requests that he be resentenced to a term-of-years sentence before a different judge.  The following factors guide a reviewing court's determination of whether remand to a different judge is required:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.  [*People v Hill*, 221 Mich App 391, 398; 561 NW2d 862 (1997) (quotation marks and citations omitted).]

See also *Sparks v Sparks*, 440 Mich 141, 163; 485 NW2d 893 (1992) (reassigning the case to a different judge on remand because the appearance of justice would be better served with a new judge presiding).

The resentencing judge rendered his findings after a lengthy three-day hearing, in which he determined that life without parole remained the just and proportionate sentence for Granger.  In handing down his sentence, the judge cited and concurred with the original trial judge's statement at sentencing in 1984 that "[t]here comes a time when society has to say enough, and you forfeit your right to live in society."  Given the "certainty and vigor with which the [resentencing] judge expressed [his] findings," *People v Pillar*, 233 Mich App 267, 271; 590 NW2d 622 (1998), it is reasonable to expect that he would have substantial difficulty in setting aside those feelings and findings at another resentencing.  The resentencing judge also made a number of clearly erroneous findings that infected his overall proportionality analysis, and which we are concerned would bias the judge's resentencing discretion on remand.  Preserving the appearance of justice, therefore, supplies an additional reason for Granger to be resentenced on remand before a new judge.[6]

## IV.  CONCLUSION

The resentencing court clearly erred in several of its factual findings regarding the *Miller* factors.  Granger's childhood environment was exceptionally turbulent, contributing to his transient immaturity and other hallmark features of youth.  Granger has also shown significant rehabilitation throughout his nearly 40 years in prison that counsel against a life-without-parole sentence.  Analysis of the *Miller* factors and the overall evidence heavily mitigates in favor of a term-of-years sentence, as the evidence did not establish that Granger was the "the rare juvenile offender whose crime reflects irreparable corruption."

---

[6] Because we remand for a term-of-years sentence, we decline to address Granger's constitutional argument seeking a categorical bar to life-without-parole sentences for juvenile offenders convicted of felony murder.  And since we have granted Granger the relief he requests, it is also unnecessary to consider his claim of ineffective assistance of counsel at the resentencing hearing.

We vacate Granger's sentence of life without parole and remand for reassignment and resentencing to a term of years consistent with MCL 769.25(9). Resentencing must occur within 28 days. This opinion has immediate effect. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Kristina Robinson Garrett